## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

CARLOS RUBEN RIVAS,

     Petitioner,

v.                                                                    Case No. 8:21-cv-2083-KKM-CPT

SECRETARY, DEPARTMENT
OF CORRECTIONS,

     Respondent.

_____

## <u>ORDER</u>

Carlos Ruben Rivas, a Florida prisoner, timely[1] filed a pro se Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 challenging his state court convictions based on alleged errors of the state courts and alleged failures of his trial counsel. (Doc. 1.) Having considered the petition, (*id.*), the supplements to the petition, (Docs. 1-1 & 7), the response in opposition, (Doc. 8), and the reply, (Doc. 9), the petition is denied. Because reasonable jurists would not disagree, a certificate of appealability also is not warranted.

---

[1] A state prisoner has one year from the date his judgment becomes final to file a § 2254 petition. *See* § 2244(d)(1). This one-year limitation period is tolled during the pendency of a properly filed state motion seeking collateral relief. *See* § 2244(d)(2). Rivas's convictions and sentences were affirmed on February 22, 2019. (Doc. 8-2, Ex. 41.) His judgment became final 90 days later, on May 23, 2019, when the time to petition the Supreme Court of the United States for a writ of certiorari expired. *See Bond v. Moore*, 309 F.3d 770, 774 (11th Cir. 2002). After 235 days of untolled time elapsed, Rivas filed his postconviction motion on January 14, 2020. (*Id.*, Ex. 43.) The motion remained pending until the state appellate court's mandate issued on October 12, 2021. (*Id.*, Ex. 55.) By that time, Rivas had already filed his § 2254 petition on August 25, 2021. Rivas's petition is therefore timely.

I.    <u>BACKGROUND</u>

A. Procedural Background

A state court jury convicted Rivas of one count of premeditated first-degree murder and one count of theft. (Doc. 8-2, Ex. 33.) The state trial court sentenced him to life in prison. (*Id.*, Ex. 34.) The state appellate court per curiam affirmed the convictions and sentences. (*Id.*, Ex. 41.) Rivas sought postconviction relief under Florida Rule of Criminal Procedure 3.850. (*Id.*, Exs. 43 & 47.) The state court denied his motion. (*Id.*, Ex. 48.) The state appellate court per curiam affirmed the denial. (*Id.*, Ex. 52.)

B. Factual Background[2]

On November 17, 2012, Rivas flagged down Officer Roger Brown at a traffic light and stated that he had murdered somebody. (Doc. 8-2, Ex. 31, pp. 163-66.) Officer Brown pulled over and made contact with Rivas at a gas station. (*Id.*, pp. 166-67.) Rivas appeared upset; his eyes were red and it looked to Officer Brown like Rivas had been crying. (*Id.*, p. 167.) Officer Brown read Rivas his *Miranda*[3] rights from a Tampa Police Department form. (*Id.*, pp. 168-69.) Rivas indicated that he understood his rights, said that he was willing to talk, and initialed a form consenting to be interviewed. (*Id.*, pp. 170-71.)

---

[2] The factual summary is based on the trial transcript and appellate briefs.

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

Rivas explained to Officer Brown that he had met and befriended the victim, Darryl Brown, two days earlier on November 15, 2012, and invited the victim to his apartment. (*Id.*, pp. 171-72.) Rivas stated that the next morning, the victim gave him money to buy alcohol and things for the apartment. (*Id.*, p. 172.) But instead of purchasing the agreed-upon items, Rivas stated, he bought drugs and became worried because he thought the victim would be angry. (*Id.*) Rivas stated that he thought about it for a while and decided he needed to kill the victim. (*Id.*, p. 173.) When Rivas returned to the apartment, the victim was sleeping on his bed. (*Id.*) Rivas placed a towel on the victim's head and hit the victim over the head several times with a "workout bar." (*Id.*) Rivas stated that he was upset, that he had left the body in the apartment for a day, and that he was trying to decide what to do. (*Id.*)

Rivas consented to a search of his apartment and gave his apartment keys to Officer Brown. (*Id.*, pp. 174-75.) Rivas started preparing a written statement, but stopped and said that he would tell police everything they needed to know. (*Id.*, pp. 179-80.) Rivas was transported to the police station for a formal interview. (*Id.*, p. 180.) During his conversation with Rivas at the gas station, Officer Brown had no problem understanding Rivas. (*Id.*, p. 170.) Rivas communicated and answered questions appropriately and never appeared confused or gave confusing answers. (*Id.*, pp. 170-71.)

At the police station, Detective Charles Massucci conducted the interview. Officer Brown and another officer were also present. Detective Massucci put his digital recorder on the table, and believed that it was recording the conversation. (*Id.*, pp. 372-74.) Several minutes after the interview started, Officer Brown also began recording it on his cell phone to assist him with writing a report. (*Id.*, p. 183.) Detective Massucci later realized that his recording device malfunctioned and recorded none of the interview. (*Id.*, p. 374.) Brown's cell phone recording did not capture the beginning of the interview, including the discussion of *Miranda.* (*Id.*, pp. 377.)

At trial, Detective Massucci testified to the portions of the interview not contained in the recording. He referred to the *Miranda* waiver form that Rivas had signed and asked Rivas if he wanted Detective Massucci to read it to him or if he wanted to read it himself. (*Id.*, pp. 378-79.) Rivas responded that he did not want Detective Massucci to read him his rights, and agreed to talk. (*Id.*, p. 379.) Rivas gave more details of the events, explaining that he met the victim at a Dunkin' Donuts on November 15, 2012, and that the victim had lost his identification and bank card. (*Id.*, pp. 379, 381.) Rivas offered to push the victim in his wheelchair to the bank. (*Id.*, pp. 379-80.) There, the victim got a temporary bank card. (*Id.*, p. 381.) Rivas stated that he pushed the victim's wheelchair back to Rivas's apartment and allowed him to stay there. (*Id.*, pp. 381-82.)

The victim stated that they should have a drink and buy a DVD player to watch movies. (*Id.*, p. 383.) The victim gave Rivas approximately $400.00 to buy items including a DVD player, alcohol, and cigarettes. (*Id.*, p. 384.) Instead, Rivas spent the money on rock cocaine and smoked it. (*Id.*, p. 384.) Rivas told Detective Massucci that when he returned to the apartment the victim questioned him about the items, and he tricked the victim to obtain the temporary bank card and security code. (*Id.* p. 385.)

The audio recording apparently captured the remainder of the interview; therefore, after Detective Massucci concluded his testimony about the beginning of the interview, the audio recording was played before the jury. On the recording, Rivas stated that he thought the victim would be unhappy that he spent the money, so Rivas hit him on the head when he was sleeping. (*Id.*, p. 388.) Rivas stated that he could not believe he came to that decision and accepted responsibility for the victim's death. (*Id.*, pp. 388-90.) Rivas stated that he struck the victim with a heavy bar and that the bar was still by the door. (*Id.*, p. 395.) He stated that he thought about doing it the whole night. (*Id.*, p. 395-96.) Rivas stated that after the victim died, he withdrew more money and went to a hotel. (*Id.*, p. 390.) Rivas stated that he flagged down Officer Brown because the victim deserved to be moved from the apartment and be buried. (*Id.*, p. 389.)

At one point in the recording, Rivas stated that he was under the influence of alcohol. (*Id.*, pp. 391-92.) Detective Massucci responded that Rivas was conversing clearly,

and asked Rivas whether it was affecting him medically or psychologically. (*Id.*, p. 392.) Rivas responded, "emotionally." (*Id.*) Detective Massucci responded that he could tell Rivas was upset, that Rivas had been forthright, and that he wanted to be clear that Rivas was not impaired or confused. (*Id.*) Rivas responded, "(Indiscernible) no." (*Id.*)

Police found the deceased victim on a mattress in Rivas's apartment. (*Id.*, pp. 219-20, 269.) Behind a door in the apartment was what crime scene technician Alison Arnold described as a "home gym weight bar." (*Id.*, p. 220.) She also observed possible drug paraphernalia and recovered the victim's bank statement. (*Id.*, pp. 220-21, 230-32.) Rivas indicated to police that he had some receipts, and that the victim's bank card was in his wallet. (*Id.*, pp. 393-94, 397.) Receipts recovered from Rivas's person and apartment displayed the last four digits of the temporary bank card, which was found in Rivas's wallet. (*Id*, pp. 227-28, 413.) The cause of the victim's death was "blunt impact to the head with skull fractures and cerebral lacerations," which are "tearing of the brain." (*Id.*, p. 325.) The victim had no defensive wounds. (*Id.*)

After his arrest, Rivas was housed at the Falkenburg Road Jail. He attended his first appearance hearing on December 1, 2012, from the hearing room at the jail. (*Id.*, pp. 331-32.) After the hearing, Rivas told Deputy Rohit Setia that he and the victim got into an argument about missing money and Rivas killed the victim in his apartment with workout equipment. (*Id.*, pp. 334-35, 337.) Deputy Wayne Coker then transported Rivas back to

his cell, and Rivas stated that he beat the victim to death with a metal pipe and that he smoked crack on top of the victim's body as the victim was "gurgling." (*Id.*, pp. 351-52.)

## II.   STANDARD OF REVIEW UNDER SECTION 2254

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs this proceeding. *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1364 (11th Cir. 2009). Habeas relief under the AEDPA can be granted only if a petitioner is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). "The power of the federal courts to grant a writ of habeas corpus setting aside a state prisoner's conviction on a claim that his conviction was obtained in violation of the United States Constitution is strictly circumscribed." *Green v. Sec'y, Dep't of Corr.*, 28 F.4th 1089, 1093 (11th Cir. 2022).

Section 2254(d) provides that federal habeas relief cannot be granted on a claim adjudicated on the merits in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of § 2254(d)(1), the phrase "clearly established Federal law" encompasses the holdings only of the United States Supreme Court "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). This section "defines two categories of cases in which a state prisoner may obtain federal habeas relief with respect to a claim adjudicated on the merits in state court." *Id.* at 404. First, a decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Id.* at 413.

Second, a decision involves an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* The AEDPA was meant "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). Accordingly, "[t]he focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, and . . . an unreasonable application is different from an incorrect one." *Id.* at 694. As a result, to obtain relief under the AEDPA, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was

8

an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011); *see also Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (stating that "[t]he state court's application of clearly established federal law must be objectively unreasonable" for a federal habeas petitioner to prevail and that the state court's "clear error" is insufficient).

When the last state court to decide a federal claim explains its decision in a reasoned opinion, a federal habeas court reviews the specific reasons as stated in the opinion and defers to those reasons if they are reasonable. *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). But the habeas court is "not limited by the particular justifications the state court provided for its reasons, and [it] may consider additional rationales that support the state court's determination." *Jennings v. Secretary, Fla. Dep't of Corr.*, 55 F.4th 1277, 1292 (11th Cir. 2022). When the relevant state-court decision is not accompanied with reasons for the decision—such as a summary affirmance without discussion—the federal court "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale [and] presume that the unexplained decision adopted the same reasoning." *Wilson*, 138 S. Ct. at 1192. The state may "rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision . . . ." *Id.*

For purposes of § 2254(d)(2), "it is not enough to show that 'reasonable minds reviewing the record might disagree about the finding in question.' " *Brown v. Davenport*, 142 S. Ct. 1510, 1525 (2022) (quotations omitted). "An unreasonable determination of the facts occurs when the direction of the evidence, viewed cumulatively, was too powerful to conclude anything but the petitioners factual claim." *Teasley v. Warden, Macon State Prison*, 978 F.3d 1349, 1355 (11th Cir. 2020) (internal quotation marks and alterations omitted). A state court's findings of fact are presumed correct, and a petitioner can rebut the presumption of correctness afforded to a state court's factual findings only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Even where a petitioner succeeds in rebutting the presumption, he must show that the state court's decision is "based on" the incorrect factual determination. *Pye v. Warden, Ga. Diagnostic Prison*, 50 F.4th 1025, 1035 (11th Cir. 2022). This is because a state court decision may still be reasonable "even if some of the state court's individual factual findings were erroneous—so long as the decision, taken as a whole, doesn't constitute an 'unreasonable determination of the facts' and isn't 'based on' any such determination." *Id.* (quoting *Hayes v. Sec'y, Fla. Dep't of Corr.*, 10 F.4th 1203, 1224–25 (11th Cir. 2021) (Newsom, J., concurring)).

## III.   INEFFECTIVE ASSISTANCE OF COUNSEL

Rivas brings a claim for ineffective assistance of trial counsel under the Sixth Amendment. Under the well-known, two-part standard articulated in *Strickland v. Washington*, 466 U.S. 668 (1984), to succeed, he must show both deficient performance by his counsel and prejudice resulting from those errors. *Id.* at 687.

The first part "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* The lynchpin of this analysis is whether counsel's conduct "was reasonable considering all the circumstances." *Id.* at 688. A petitioner establishes deficient performance if "the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance." *Id.* at 690. A court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*

The second part requires showing that the deficient performance prejudiced the defense. *Id.* at 687. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691. To demonstrate prejudice, a petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would

11

have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

"The question [on federal habeas review of an ineffective assistance claim] 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.' " *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)). Consequently, federal petitioners rarely prevail on claims of ineffective assistance of counsel because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (quotation and citations omitted).

## IV.   ANALYSIS

### A. Ground One

Rivas contends that trial counsel was ineffective for failing to object to the trial court's response when the jury submitted a written question during deliberations that read, "Jury wondering if there is a transcript available of the audio recording." (Doc. 8-2, Ex. 31, p. 501 & Ex. 32.) When the trial court told the attorneys about the question, the court stated, "I'm going to say there is no transcript available of the audio recording." (Doc. 8-2, Ex. 31, p. 502.) Counsel said, "That's fine, Judge." (*Id.*) The trial court's written response stated, "Members of the jury, I have discussed your question/note with the attorneys. There

12

is no transcript available of the audio recording." (*Id.*, Ex. 32.) The jury did not ask any other questions, and the transcript reflects no further activity until the jury returned the verdict. (*Id.*, Ex. 301, p. 502.)

In his amended postconviction motion, Rivas stated that "[t]he jury's request for transcripts should have been interpreted as the need for Exhibit #3, the audio CD which contained the Defendant, Carlos Ruben Rivas' alleged confession and statements to Detective Massucci during his formal interrogation." (Doc. 8-2, Ex. 47, doc. p. 1258.) Rivas also asserted that a prepared transcript existed. (*Id.*) He further argued that the court should have provided a read back or play back of the interview. (*Id.*, doc. pp. 1258-59.)

When Rivas raised the ineffective assistance claim in his first postconviction motion, the state court dismissed it because Rivas's "allegations [we]re facially insufficient as he failed to alleged prejudice" under *Strickland*. (Doc. 8-2, Ex. 46, p. 4.) The state court allowed Rivas to file an amended motion and he did so. (*Id.* & Ex. 47.) The state court found that Rivas "still failed to allege prejudice" in his amended motion. (*Id.*, Ex. 48, p. 8.) The state court denied his ineffective assistance claim with prejudice because Rivas failed to cure the "facial deficiency in his ineffective assistance of counsel claim." (*Id.*)

The denial of Rivas's claim for failure to amend it to include the necessary allegation of *Strickland* prejudice was an adjudication of the claim on the merits. *See Borden v. Allen*, 646 F.3d 785, 808-16 (11th Cir. 2011) (examining a state postconviction court's rejection

of a claim for failure to plead the claim with sufficient specificity and stating that the state court's "consideration of the sufficiency of the pleadings concerning a federal constitutional claim [in a postconviction motion] necessarily entails a determination on the merits of the underlying claim"); *Gaedtke v. Sec'y, Dep't of Corr.*, 369 F. App'x 12, 13-14, 16 n.2 (11th Cir. 2010) (stating that a state court's denial of an ineffective assistance claim as facially insufficient when the petitioner did not allege he was prejudiced and therefore "failed the prejudice prong of *Strickland*" was a denial on the merits entitled to deference under § 2254(d)(1)).

Rivas does not show that the state court's denial of his claim involved an unreasonable application of *Strickland*. A petitioner must establish a reasonable probability that the outcome of the proceeding would have been different due to counsel's alleged deficient performance before he can obtain relief under *Strickland. See, e.g., Romine v. Head*, 253 F.3d 1349, 1357 (11th Cir. 2001) ("A petitioner has the burden of establishing his right to federal habeas relief and of proving all facts necessary to show a constitutional violation."). Rivas's amended motion did not clearly and expressly allege *Strickland* prejudice as a result of counsel's performance, even though the state court allowed him to amend his claim to do so. Because Rivas's failure to plead facts sufficient to support a finding of prejudice in his amended postconviction motion resulted in a failure to establish

14

prejudice as he must to obtain relief, he does not show that the state court's denial of his claim involved an unreasonable application of *Strickland*.

Alternatively, even if Rivas showed that the state court's ruling was unreasonable, he cannot obtain relief. In his amended postconviction motion, Rivas stated, "[t]he verdict of guilty could not have been obtained without the assistance of omitting evidence favorable to the Defendant." (Doc. 8-2, Ex. 47, doc. p. 1262.) This statement does not specify the evidence, but in the context of his ineffective assistance claim, it could be taken to assert that the outcome of trial would have been different had counsel objected to the trial court's proposed response. Rivas further asserted that "[h]ad the evidence not been withheld" from the jury during deliberations, the jury would have noticed that "there is no valid on-the-record waiver" of his *Miranda* rights and the jury "would have given a second thought" to his ability to waive his rights "while under the influence of drugs and alcohol and emotionally impaired." (Doc. 8-2, Ex. 47, doc. pp. 1261-62.)

Assuming that these statements were sufficient to allege prejudice and that the state court's decision was therefore unreasonable, Rivas would be entitled to de novo review of his claim. *See Daniel v. Comm'r, Ala. Dep't of Corr.*, 822 F.3d 1248, 1260 (11th Cir. 2016) ("Once a federal court determines that a state court decision is unreasonable under § 2254(d), '[the court is] unconstrained by § 2254's deference and must undertake a de novo review of the record.' " (quoting *Adkins v. Warden, Holman CF*, 710 F.3d 1241,

1255 (11th Cir. 2013))). Even under de novo review, Rivas's ineffective assistance claim warrants no relief because it is too speculative to show a reasonable probability of a different outcome at trial.

Initially, it is not apparent that the jury could not access the audio recording during deliberations. The CD containing the recording was entered into evidence as State's Exhibit 3. (Doc. 8-2, Ex. 31, pp. 376-77.) The jury was instructed that "[d]uring trial, certain items may have been received into evidence as exhibits. You may examine whatever exhibits you think will help you in your deliberations, and those exhibits will be sent into the jury room with you when you begin to deliberate." (*Id.*, p. 498.)

Further, having heard the audio recording as well as the officers' testimony about the interview, the jury knew that the recording did not capture the discussion of *Miranda* that occurred at the outset. The jury was aware that Detective Massucci's recording device malfunctioned and that Officer Brown's cell phone only recorded part of the interview. Moreover, the jury was able to consider Rivas's demeanor as reflected in the audio recording and as addressed in Detective Massucci's testimony about the interview. Therefore, Rivas has not established a reasonable probability of a different outcome even if counsel had successfully requested that the trial court take the jury's question about the transcript as a request for the audio recording.

16

Rivas also contends that a transcript of the recorded interview had been prepared, and that counsel should have requested that it be provided to the jury. In support, he attached to his amended postconviction motion both an amended notice of discovery that lists "Transcript of Defendant's Interview" and the transcript. (Doc. 8-2, Ex. 47, doc pp. 1266-77.) But Rivas does not show that this transcript could have been provided to the jury because there is no indication it was ever entered into evidence. The portions of the trial transcript where the CD of the audio recording was entered into evidence and published to the jury do not mention a transcript. (Doc. 8-2, Ex. 31, pp. 376-77, 386-97.) Florida Rule of Criminal Procedure 3.400 limits the materials permitted into the jury room, and does not allow for items not received into evidence other than a copy of the charges, verdict forms, and a written copy of the jury instructions. Further, the transcript of the interview reflects Rivas's incriminating statements, shows his appropriate communication with the officers, and contains Rivas's unambiguous statement that he was not confused about what he was saying. (Doc. 8-2, Ex. 47, doc pp. 1266-77.) Rivas has not clearly specified which portions of the transcript would give rise to a reasonable probability that the jury would have reached a different verdict had the transcript been provided.

Finally, Rivas asserts that counsel should have objected based on Florida Rule of Criminal Procedure 3.410, which governs jury requests to review evidence. If the jury requests transcripts of trial testimony, the trial judge "must deny the requests for

transcripts" but "must instruct jurors that they can, however, request to have any testimony read or played back, which may or may not be granted at the court's discretion." Fla. R. Crim. P. 3.410(b)(1)-(2). Rivas appears to contend that counsel should have asserted that the trial court was required to inform the jury that they could request a read back of the interview as taken down by the court reporter.

Even if the trial court so informed the jury, the jury requested a read back, and the trial court granted the request, Rivas fails to show a reasonable probability of a different verdict. Again, the interview contained Rivas's incriminating statements and reflected that he was able to communicate clearly with the officers. Further, the jury had heard Detective Massucci's testimony about the interview and Rivas's behavior and demeanor. Rivas's assertion of prejudice is too speculative to show entitlement to relief under *Strickland*. *See Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991) (stating that a petitioner's "unsupported allegations" that are "conclusory in nature and lacking factual substantiation" cannot sustain an ineffective assistance claim). Rivas has not shown a reasonable probability of a different outcome had counsel objected to the trial court's response. He is not entitled to relief on Ground One.

## B. Ground Two

Rivas argues that the trial court erred in denying his request to present expert testimony on his "frontal lobe impairment" and how such impairment "impacted his ability

to form the specific intent to commit first-degree premeditated murder." (Doc. 1, p. 8.) Under Florida law, premeditated first-degree murder requires that the "unlawful killing of a human being" was "perpetrated from a premediated design to effect the death of the person killed . . ." § 782.04(1)(a)1., Fla. Stat.

The question of what evidence could or should have been permitted to support the specific intent required for first-degree premeditated murder is a question of state law. As a result, Ground Two does not raise a claim for relief based on federal law. Therefore, it is not cognizable on federal habeas review. *See Branan v. Booth*, 861 F.2d 1507, 1508 (11th Cir. 1988) ("[A] habeas petition grounded on issues of state law provides no basis for habeas relief."). Even if the Court liberally construes Ground Two as bringing a federal due process claim, which Rivas raised on direct appeal, he is not entitled to relief.

Rivas moved to admit expert testimony about his frontal lobe impairment in order to negate the element of specific intent. (Doc. 8-2, Ex. 26.) Rivas sought to admit testimony of a psychiatrist, Dr. Deborah Barnett. (*Id.*, p. 2.) The state trial court held a hearing on Rivas's motion. (Doc. 8-2, Ex. 28.) Dr. Barnett diagnosed Rivas with major depressive disorder and cocaine use disorder. (*Id.*, pp. 19-20.) Dr. Barnett ordered an MRI of Rivas because she believed there was a strong possibly of problems with his executive functioning, which might be represented in the frontal lobes. (*Id.*, pp. 22-23.) She testified that executive functioning refers to higher-level brain function such as organization,

inhibition, and appreciation of long-term consequences, as well as visual, language, and memory functions. (*Id.*, pp. 23-24.) The MRI images showed particularly dense areas in Rivas's frontal lobes called hyperintensities that were "consistent with and sort of substantiate the functional abnormalities" and "oddities" of Rivas's behavior Dr. Barnett observed by interviewing Rivas and studying his history. (*Id.*, pp. 48-51.) Such functional or behavioral issues included impulse control, the ability to appreciate long-term consequences, and organization. (*Id.*)

Dr. Barnett concluded that Rivas's ability to have specific intent was impaired and that his frontal lobe impairment helped explain his actions. (*Id*, pp. 50, 52.) She stated that the information before her, including the MRI, is "consistent in showing that there is some impairment in certain executive functions, . . . and that it's [that impairment] - - that in addition to depression - - actually contribut[ed] to the killing of Mr. Brown." (*Id*, pp. 59-60.) Dr. Barnett did not find that Rivas was insane at the time of the murder and she found that he was competent when she talked to him. (*Id.*, pp. 51-52.)

The state trial court denied Rivas's motion. The state trial court concluded that if Dr. Barnett had been able to say that some physical abnormality in Rivas's brain alone caused his lack of ability to form specific intent, her testimony would have been admissible.

(*Id.*, p. 68-69.)[4] But because Dr. Barnett could not "disassociate a physical abnormality with the associated psychiatric conditions," the state court found her testimony inadmissible. (*Id.*, p. 69.) In other words, the state court determined that no physical issue stood apart from Rivas's mental condition. Florida law does not recognize a defense of diminished mental capacity. *See Evans v. State*, 946 So.2d 1, 11 (Fla. 2006) ("[D]iminished capacity is not a viable defense in Florida."); *Hodges v. State*, 885 So.2d 338, 352 n.8 (Fla. 2004) ("This Court has held on numerous occasions that evidence of an abnormal mental condition not constituting legal insanity is inadmissible to negate specific intent.").

The state trial court reasonably denied Rivas's motion to admit Dr. Barnett's testimony. The Constitution does not prohibit a state from categorically excluding "expert opinion evidence 'from consideration on the element of mens rea . . .' " *United States v. Litzky*, 18 F.4th 1296, 1305 (11th Cir. 2021) (quoting *Clark v. Arizona*, 548 U.S. 735, 764 (2006)). In *Clark*, the defendant was not permitted to present evidence of mental illness short of insanity to rebut evidence of criminal intent. 548 U.S. at 744. "Because of [the] risk" that "mental-disease evidence on mens rea can . . . easily mislead" a jury, "the Court held that it was constitutionally permissible for Arizona 'to avoid confusion and

---

[4] The state trial court gave as examples other cases in which an "epileptic seizure is clearly a physical condition that prohibited someone's ability to form intent to commit a crime" or "the defendant in a vehicular homicide can assert that he had a stroke or a seizure or something else that rendered him incapable of forming intent to commit a crime . . ." (Doc. 8-2, Ex. 28, p. 69.)

misunderstanding on the part of jurors' by 'confining consideration of this kind of evidence to insanity.' " *Litzky*, 18 F.4th at 1305 (quoting *Clark*, 548 U.S. at 776). Thus, Rivas does not show a violation of his federal rights based on Florida's categorical exclusion of evidence of diminished mental capacity to negate specific intent.

Furthermore, the state court did not unreasonably interpret Dr. Barnett's testimony. Dr. Barnett believed that Rivas's executive functioning impairment in addition to his depression contributed to his committing the murder. (Doc. 8-2, Ex. 28, pp. 59-60.) And at the conclusion of Dr. Barnett's testimony, the trial court asked whether she could render an opinion that Rivas lacked specific intent to commit murder solely on the MRI results. (*Id.*, p. 60.) Dr. Barnett responded, "I would not do so." (*Id.*) Thus, the record supports the state court's conclusion that Dr. Barnett's opinion on Rivas's ability to form specific intent was not based solely on a physical abnormality as reflected in the MRI.

Rivas does not establish that the state court's rejection of his claim was contrary to or involved an unreasonable application of clearly established federal law. Nor does he show that it was based on an unreasonable factual determination. Rivas is not entitled to relief on Ground Two.

## C. Ground Three

Rivas asserts that the trial court erred in denying his motion to suppress his statements to Officer Brown and Detective Massucci due to ineffective *Miranda* warnings.

22

He refers to the warnings Officer Brown gave him at the gas station. Rivas also refers to the police station interview, when Detective Massucci began to advise him of his *Miranda* rights before Rivas stated that he knew his rights and wanted to talk. Rivas states that the recording on Officer Brown's cell phone was missing "between four and five minutes of the initial part of the interview. The alleged waiver of the *Miranda* rights was not recorded." (Doc. 1, p. 12.)

### 1. Statements at the Gas Station

Rivas acknowledged that at the gas station, Officer Brown informed him of *Miranda* in accord with a standard form. (Doc. 8-2, Ex. 16, p. 4.) But Rivas asserted that he did not knowingly, voluntarily, and intelligently waive his right to remain silent and his right to counsel under the Fifth Amendment due to the effects of cocaine and alcohol and his "emotional state." (*Id.*, pp. 4-6.)

At the suppression hearing, Officer Brown testified that Rivas appeared upset but that Rivas listened, signed the form, and stated that he understood. (Doc. 8-2, Ex. 9, pp. 46, 49.) Rivas explained to Officer Brown how he met the victim, how he decided he needed to kill the victim after spending the victim's money on rock cocaine, and how he committed the murder. (*Id.*, pp. 51-53.) Officer Brown agreed that Rivas had bloodshot and glassy eyes like maybe he was under the influence "at some point" but did not recall smelling alcohol when he came into contact with Rivas. (*Id.*, pp. 53, 66.) Officer Brown

stated that Rivas said he used crack cocaine earlier in the day and that he had been drinking earlier. (*Id.*, pp. 72-73.)

Officer Brown testified that Rivas's communications were very clear and articulate, that Rivas did not slur his words or say anything incomprehensible, and that Rivas never appeared confused or as if he did not understand Officer Brown. (*Id.*, 53.) Officer Brown stated that he would not proceed with an interview if he had concerns that a subject was so intoxicated that he might not understand the conversation and that he had no such concerns. (*Id.*, pp. 61-62.) Officer Brown summarized that Rivas was upset but was calm and able to maintain the conversation. (*Id.*, p. 66, 76-77.)

The state court denied Rivas's motion. The state court noted Detective Massucci's testimony that during the interview at the station, Rivas stated that he had ingested alcohol and cocaine before coming into contact with Officer Brown. (Doc. 8-2, Ex. 9, pp. 91-92; Ex. 22, p. 5.) Detective Massucci stated that Rivas said he last used rock cocaine 30 to 60 minutes before trying to contact law enforcement near the gas station; in ruling on the motion to suppress, the trial court recalled the timeframe as approximately 30 to 45 minutes before coming into contact with Officer Brown. (Doc. 8-2, Ex. 9, p. 91; Ex. 22, p. 5.) The state court considered "any issues regarding" Rivas's mental health and the influence of "alcohol and/or drugs" when the statements were made, along with testimony that Rivas's statements "were clear and concise" and were "rational and logical" in

explaining what happened. (Doc. 8-2, Ex. 22, ., pp. 5-6.) The state court concluded that under the circumstances, the *Miranda* warnings were not ineffective and that Rivas made a knowing and voluntary waiver of his right to remain silent. (*Id.*, p. 6.)

The state court did not unreasonably deny Rivas's motion to suppress. *Miranda* holds that, under the Fifth Amendment, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. at 444. *Miranda* requires a waiver to be made "voluntarily, knowingly and intelligently." *Id.* The waiver of *Miranda* rights must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). The waiver "must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* "Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Id.* (quoting *Fare v. Michael C.*, 442 U.S. 707 (1979)).

"A confession that was not the product of free will and rational[ ] intellect or that was made when the individual's will was overborne by physical, psychological, or drug-induced means, is inadmissible." *Parker v. Allen*, 565 F.3d 1258, 1280 (11th Cir. 2009)

(internal quotation marks and citation omitted). But the fact that a suspect may have consumed alcohol or drugs or had mental health concerns will not necessarily invalidate a *Miranda* waiver. *See Colorado v. Connelly*, 479 U.S. 157, 164 (1986) (stating that "a defendant's mental condition, by itself and apart from its relation to official coercion," is insufficient to warrant suppression of a confession).

When a suspect has "taken drugs prior to giving the statement," the statement is not automatically inadmissible; rather, "[t]he evidence must show the defendant was so affected as to make his statement, after appropriate warnings, unreliable or involuntary" to warrant suppression. *United States v. Taylor*, 508 F.2d 761, 763 (5th Cir. 1975); *see also Hubbard v. Haley*, 317 F.3d 1245, 1253-54 (11th Cir. 2003) (concluding that a suspect's statement was not involuntary despite the suspect's alcohol consumption on the day of the crime, chronic alcoholism, and being given a drink before signing his statement, when numerous witnesses testified that he did not appear intoxicated); *Grayson v. Thompson*, 257 F.3d 1194, 1230 (11th Cir. 2001) (stating that the trial court's finding that a suspect's confession was voluntary despite his claims of intoxication, alcohol withdrawal, and coercion, was supported by suppression hearing testimony that the officer did see any indications of alcohol or drug use; that the suspect was not slurring his speech; and that the suspect's general demeanor appeared "normal" to the officer even though he was nervous and fidgety at times).

26

The state court acknowledged that Rivas had consumed alcohol and cocaine. (Doc. 8-2, Ex. 22, p. 4.) Officer Brown noticed Rivas's red and watery eyes, and Rivas told him about his alcohol and drug consumption. (*Id.*, Ex. 9, pp. 53, 72-73.) But Officer Brown observed that Rivas never appeared confused and that Rivas communicated clearly and in an articulate manner. (*Id.*, p. 53.) Officer Brown testified that Rivas understood what was happening and provided a detailed narrative about the murder and the events leading to it. (*Id.*, pp. 51-53.)

Thus, there was evidence before the state court from which it could reasonably conclude that, under the totality of the circumstances, Rivas's waiver of his *Miranda* rights was both "an uncoerced choice" and involved "the requisite level of comprehension" as required to satisfy the Fifth Amendment. *See Moran*, 475 U.S. at 421. Officer Brown testified that despite Rivas's earlier consumption of drugs and alcohol, Rivas's speech and communication were clear and understandable, and that Rivas never appeared confused or like he did not understand Officer Brown. Rivas has not shown that the state court's denial of his motion to suppress statements made at the gas station was contrary to or involved an unreasonable application of clearly established federal law, or was based on an unreasonable factual determination.[5]

---

[5] To the extent that the state court implicitly found Officer Brown's testimony credible, Rivas does not rebut the presumption of correctness afforded to that determination by clear and convincing evidence. *See Rolling v. Crosby*, 438 F.3d 1296, 1301 (11th Cir. 2006) ("The factual findings of the state court, including

### 2. Statements at the Police Station

Rivas argued that at the time of the police station interview, "he was under the influence of drugs and also suffering from effects of his mental illness." (Doc. 8-2, Ex. 7, p. 1.) Rivas stated that he "did not knowingly, voluntarily, and intelligently waive his constitutional right to remain silent or his right to counsel" because at the time of questioning, "he was at the end of a crack binge and suffering from mental illness." (*Id.*, pp. 2, 5.)

At the suppression hearing, Detective Massucci testified when he began the police station interview, he had the waiver of rights form that Rivas signed earlier. (Doc. 8-2, Ex. 9, p. 84.) Detective Massucci testified that he referred to the waiver and intended to review Rivas's rights again but Rivas requested that the form not be read to him in its entirety. (*Id.*) Rivas told Detective Massucci that he knew his rights and that he wanted to talk. (*Id.*, p. 85.) Detective Massucci testified that he asked Rivas if he wanted Detective Massucci to read them directly from the form and that Rivas said there was no need. (*Id.*)

Detective Massucci testified that, while addressing *Miranda*, there was no indication that Rivas did not understand what was happening. (*Id.*, p. 88.) Detective Massucci agreed that Rivas "had a tiredness" that indicated he had been awake "for a while"

---

the credibility findings, are presumed to be correct unless [the petitioner] rebuts the presumption by clear and convincing evidence." (citing 28 U.S.C. § 2254(e)(1)).

or "had been coming down or removed from the effects of the adrenaline that rock cocaine brings." (*Id.*, p. 90.) But Detective Massucci testified that he had no concerns during the interview that Rivas was under the influence of drugs such that Rivas did not understand what was going on or that would interfere with communication. (*Id.*, pp. 90-91.) Detective Massucci testified that Rivas stated that last time he took crack cocaine was a half-hour to an hour before attempting to make contact with law enforcement near the gas station. (*Id.*, p. 91.) Detective Massucci was not concerned that Rivas was under the influence of alcohol and did not observe Rivas to be drunk. (*Id.*, pp. 91-92.) Detective Massucci believed Rivas to be "upset in the sense of remorse or sadness" but had no concerns about Rivas's mental health. (*Id.*, p. 93.) Detective Massucci testified that Rivas was articulate, gave details and specific information, and never appeared confused. (*Id.*, p. 98.)

Officer Brown, who was also present, testified that during the interview, Rivas showed no signs that he did not understand the proceedings and that he provided details about the crime. (*Id.*, pp. 59-60.) Officer Brown had no concerns at the police station that Rivas was so intoxicated he did not know what was happening. (*Id.*, pp. 61-62.) Nor did Officer Brown have any concerns related to Rivas's use of narcotics, his mental illness, or his comprehension. (*Id.*, p. 62.)

The state trial court denied Rivas's motion. The state court weighed evidence of Rivas's consumption of alcohol and cocaine against the evidence that his statements were

clear and concise and were rational and logical in explaining the events. (Doc. 8-2, Ex. 22, pp. 5-6.) The state court also relied on Detective Massucci's statements that when Detective Massucci discussed *Miranda* at the beginning of the interview, Rivas stated that he understood his rights and that he did not need to review them again. (Doc. 8-2, Ex. 22, p. 6.) The state court found that Rivas's waiver of his rights was knowing and voluntary. (Doc. 8-2, Ex. 22, p. 6.)

Rivas does not show that the state court unreasonably denied his motion to suppress. Both Detective Massucci and Officer Brown testified about Rivas's behavior at the police station interview. Neither officer had concerns that Rivas did not understand what was happening. Rather, they testified that Rivas was articulate, communicated clearly, and gave detailed information. Therefore, as with the interview at the gas station, there was evidence from which the state court could reasonably conclude that Rivas voluntarily and knowingly waived his *Miranda* rights even though he had consumed cocaine and alcohol at some point before the interview and had alleged mental health concerns. *See Moran*, 475 U.S. at 421.[6]

Rivas does not show that the state court's denial of his motion to suppress was contrary to or involved an unreasonable application of clearly established federal law or was

---

[6] Again, to the extent that the state court's order implies that it found the officers to be credible, Rivas does not rebut the presumption of correctness afforded to that factual finding by clear and convincing evidence. *See Rolling*, 438 F.3d at 1301.

based on an unreasonable factual determination. He is not entitled to relief on Ground Three.

### D. Ground Four

Rivas argues that the trial court erred in denying his motion to suppress his statements to two detention deputies, Deputy Setia and Deputy Coker, on the basis that the statements were made without the benefit of required *Miranda* warnings and without counsel. On December 1, 2012, Rivas participated in his first appearance court hearing by video from the jail. Deputy Setia stayed with Rivas after the hearing and awaited transportation back to Rivas's cell. Deputy Coker arrived to transport Rivas. Rivas made incriminating statements to both deputies. As Rivas did on appeal, this Court will consider his remarks as "two series of statements." (Doc. 8-2, Ex. 39, p. 36.)

#### 1. Statements to Deputy Coker

Rivas moved to suppress his statements to Deputy Coker, arguing that he made the statements as a result of Deputy Coker's questioning him without *Miranda* warnings and after he signed a form invoking his right to counsel. (Doc. 8-2, Ex. 6, pp. 3-7.)

At the suppression hearing, Deputy Coker testified that he picked up Rivas to transport him from the jail's remote courtroom back to his cell in a golf cart. (Doc. 8-2, Ex. 9, p. 20.) Based on Rivas's uniform, the fact that Deputy Setia escorted him, and the way his shackles were placed, Deputy Coker believed that Rivas was deemed a suicide risk

or had made statements threatening to harm or kill himself. (*Id.*, pp. 22-23, 42-43.) Rivas looked despondent to Deputy Coker. (*Id.*, p. 23.) Believing it important to know Rivas's state of mind, Deputy Coker testified, he asked Rivas how he was doing. (*Id.*) Rivas answered that he was not good and that he did something really stupid that was probably going to send him to prison for a long time. (*Id.*) Deputy Coker did not know if Rivas was referring to something that happened at the hearing; he testified that to get more insight into Rivas's state of mind, he asked what happened. (*Id.*) Deputy Coker testified that Rivas responded by going into details about his charges. (*Id.*, p. 24.) Deputy Coker testified that he told Rivas that he needed to stop talking and to keep the information to himself, but that Rivas kept talking. (*Id.*)

Deputy Coker testified that he was not attempting to interrogate Rivas, and that he wanted to understand his mindset because if Rivas was suicidal, he might attempt to injure himself or another person during transport. (*Id.*, p. 24.) Rivas stated that he beat a man to death with a pipe over some crack. (*Id.*, p. 25.) Deputy Coker testified that he again told Rivas, "Shhh, you need to stop; you need to keep this to yourself." (*Id.*) But Deputy Coker testified that Rivas continued to talk and said that after the victim was lying on the ground unconscious, he smoked crack, listened to the victim breathe and gurgle until he died, and fell asleep on the dead body. (*Id.*) Deputy Coker testified that he told Rivas to keep those facts to himself, but that Rivas continued to talk. (*Id.*, pp. 25-26.) Deputy Coker testified

that was not familiar with the form defendants may sign at the first appearance hearing invoking the right to counsel. (*Id.*, pp. 28-29.)

The state court denied Rivas's motion to suppress. The state court noted that Rivas had previously been advised of his rights. (*Id.*, Ex. 22, p. 7.) The state court found that any incriminating statements, including responses to questions, were made "freely and voluntarily with full understanding of the fact that those statements could be, in fact, used against him at a later point in time." (*Id.*, p. 8.) The state court found that Rivas was not interrogated and the deputies did not have to advise him under *Miranda*. (*Id.*)

Rivas has not shown that the state court unreasonably denied his motion to suppress. *Miranda* is required when a person is subject to custodial interrogation or its functional equivalent. *See Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980). Thus, "the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301. Interrogation reflects a "measure of compulsion above and beyond that inherent in custody itself." *Id.* at 300. But the Fifth Amendment does not bar a defendant's volunteered statements. *See Miranda*, 384 U.S. at 478. Therefore, a court is not required to suppress "spontaneous remarks that are not a product of interrogation." *United States v. Hall*, 716 F.2d 826, 830 (11th Cir. 1983).

The state court could reasonably conclude, based on Deputy Coker's testimony, that Rivas was not subject to custodial interrogation or its functional equivalent when he made statements as he was transported.[7] Deputy Coker initially merely asked Rivas how he was doing, and his second question asking what Rivas did was not in response to any express discussion of the case. From that point, according to Deputy Coker's testimony, Rivas volunteered information about the murder despite Coker's repeatedly telling him not to say anything. Therefore, the state court could reasonably conclude that Rivas was not subject to "express questioning" about the case or other acts that Deputy Coker should have known was "reasonably likely to elicit an incriminating response" from Rivas. *See Innis*, 446 U.S. at 301. Rivas does not show that any part of his interaction with Deputy Coker violated his constitutional rights not to incriminate himself or to counsel.

It was not objectively unreasonable for the state court to determine that the administration of *Miranda* warnings was not required. Rivas does not show that the state court's ruling was contrary to or involved an unreasonable application of clearly established federal law, or was based on an unreasonable factual determination.

---

[7] Rivas does not rebut by clear and convincing evidence the presumption of correctness afforded to any implied factual finding of the state court that Deputy Coker was credible. *See Rolling*, 438 F.3d at 1301.

### 2. Statements to Deputy Setia

Rivas asserted that he was in custody when Deputy Setia questioned him about his charges without the benefit of *Miranda* warnings. (Doc. 8-2, Ex. 5, pp. 2-5.) Rivas also stated that prior to this questioning, he signed an invocation of rights form that invoked his right to counsel. (*Id.*, p. 5.) Rivas acknowledged that he initiated a conversation with Deputy Setia, but asserted that he did not go into any details of his case until Deputy Setia questioned him about the case. (*Id.*, p. 6.)

At the suppression hearing, Deputy Setia testified that after the first appearance hearing, he came into contact with Rivas for the first time. (Doc. 8-2, Ex. 11, pp. 10-12.) Deputy Setia did not know what Rivas was charged with, but knew based on Rivas's red uniform that he was in lockdown and that inmates are sometimes housed in lockdown because they face serious charges. (*Id.*, pp. 12-13.) While they waited for transportation back to Rivas's cell, Rivas asked Deputy Setia if he spoke Spanish. (*Id.*, p. 14.) Shortly after that, Deputy Setia testified, Rivas asked if he would be allowed to smoke. (*Id.*, p. 17.) Deputy Setia responded about smoking in the jail, but Rivas said he was talking about prison and that inmates could smoke when he was in prison earlier. (*Id.*) Deputy Setia asked Rivas what made him think he would be returning. (*Id.*, p. 18.) Rivas answered that it was because of his charges. (*Id.*) Deputy Setia asked what his charges were, and Rivas responded that he was charged with first-degree murder. (*Id.*)

At that point, Deputy Setia testified, he told Rivas that he might want to be careful about what he said because the microphones in the room were likely still on. (*Id.*) Deputy Setia testified that he told Rivas that this was not the time or place to be talking about this matter. (*Id.*) Deputy Setia testified that Rivas responded that he did not care and that he had already confessed to the Tampa Police Department. (*Id.*) Deputy Setia asked Rivas if he was bragging, and Rivas said he was not. (*Id.*, p. 19.) Rivas stated that he was in his apartment and killed a man. (*Id.*) Deputy Setia asked him how he was caught, and Rivas told him that after he got off his high, he turned himself in. (*Id.*, p. 19.) Rivas also told Deputy Setia that he watched the victim die, and that he thought the victim would die quickly but that it took hours. (*Id.*, p. 20.)

Deputy Setia was aware of the rights invocation forms that defendants filled out at first appearance court as part of normal procedures. (*Id.*, pp. 33-34.) Deputy Setia acknowledged that he asked Rivas questions about the case and testified that he did so for his own knowledge. (*Id.*, p. 35.) But he realized "how important it was," told his supervisor, and prepared a memo about what Rivas told him, which he believed his supervisor forwarded to Detective Massucci. (*Id.*, pp. 23, 38.)

The state court denied Rivas's motion to suppress his statements to Deputy Setia for the same reason it denied the motion regarding his statements to Deputy Coker. (Doc. 8-2, Ex. 22, pp. 7-8.) The state court found that any of Rivas's incriminating statements

were made "freely and voluntarily with full understanding of the fact that those statements could be, in fact, used against him at a later point in time." (*Id.*, p. 8.) The state court also found that Rivas initiated the conversation with Deputy Setia. (*Id.*, pp. 7-8.)

Even assuming that the state court's denial of his motion to suppress was unreasonable because the Fifth Amendment required Deputy Setia to give Rivas *Miranda* warnings before questioning him about his case, Rivas is not entitled to federal habeas relief. In this § 2254 proceeding, any constitutional error in admitting Rivas's statements to Deputy Setia must be considered under the harmless-error test articulated in *Brecht v. Abrahamson*, 507 U.S. 619 (1993). Federal habeas petitioners "are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.' " *Id.* at 637 (quoting *United States v. Lane*, 474 U.S. 438, 449 (1986)). To find actual prejudice, "a federal habeas court must conclude that the error 'had substantial and injurious effect or influence in determining the jury's verdict.' " *Id.* (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

Rivas's statements to Deputy Setia were consistent with, and largely cumulative to, the statements he made to Officer Brown, Detective Massucci, and Deputy Coker. Evidence necessary to show the premeditated first-degree murder of the victim was contained in these other statements which, as discussed above, the state court reasonably

determined were admissible.[8] Evidence corroborated Rivas's statements, such as the location and circumstances in which the victim's body was found; the presence of the exercise bar in the apartment; the cause of death as blunt impact to the head; and the presence of the victim's bank card and bank statements among Rivas's belongings. In the light of this evidence and his other statements, Rivas fails to show that the admission of his statements to Deputy Setia had a substantial and injurious effect or influence on the jury's verdict as he must under *Brecht*. Accordingly, Rivas is not entitled to relief.

## V.   CERTIFICATE OF APPEALABILITY

A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). Instead, a district court or court of appeals must first issue a certificate of appealability (COA). *Id.* "A [COA] may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To obtain a COA, Rivas must show that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues he seeks to raise. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Rivas has not made the requisite showing. Finally, because Rivas is not entitled to a COA, he is not entitled to appeal in forma pauperis.

---

[8] To show first-degree premeditated murder, the State had to prove beyond a reasonable doubt that Rivas unlawfully killed the victim and that the killing was "perpetrated from a premeditated design to effect" the victim's death. § 782.04(1)(a)1., Fla. Stat.

It is therefore **ORDERED** that Rivas's Petition for Writ of Habeas Corpus, (Doc. 1), is **DENIED**. The **CLERK** is directed to enter judgment against Rivas and in Respondent's favor and to **CLOSE** this case.

**ORDERED** in Tampa, Florida, on August 24, 2023.

Kathryn Kimball Mizelle
United States District Judge